# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

PATRICK TULLIS,               )

              Plaintiff,    )

vs.                      )    Case No.   14-cv-70-MJR-SCW

VIPIN SHAH, ALLAN MARTIN,   )
KENDRA SEIP, CHRISTINE BROWN,   )
and ART FUNK,           )

            Defendants.

## REPORT AND RECOMMENDATION

**WILLIAMS, Magistrate Judge:**

### INTRODUCTION

Pursuant to 42 U.S.C. § 1983, *pro se* Plaintiff filed his complaint alleging deliberate indifference to his stomach pain against Vipin Shah, Art Funk, and Christine Brown (Counts 1, 4, and 5).   Plaintiff also alleges that Allan Martin and Kendra Seip retaliated against him for filing grievances (Counts 2 and 3).   This matter is before the Court on motions for summary judgment filed by the Defendants (Docs. 93 and 95,96). Defendants argue that Plaintiff failed to exhaust his administrative remedies against them.   The matter has now been referred to United States Magistrate Judge Stephen C. Williams by United States District Judge Michael J. Reagan pursuant to **28 U.S.C. §§ 636(b)(1)(B) and (c)**, **Federal Rule of Civil Procedure 72(b)**, and **Local Rule 72.1(a)**. The Court held an evidentiary hearing on September 11, 2017.   Based on the following, it is **RECOMMENDED** that the Court **DENY** the summary judgment motion filed by

Defendants Funk and Shah and **GRANT IN PART AND DENY IN PART** the summary judgment motion filed by Defendants Brown, Martin, and Seip.

FACTUAL BACKGROUND

## A. Procedural Background

Plaintiff filed his original complaint on January 21, 2014 (Doc. 1). He filed a second amended complaint on May 12, 2014 (Doc. 16). Plaintiff's amended complaint alleges that Defendants Vipin Shah, Christine Brown, and Art Funk were deliberately indifferent to his serious medical needs (Counts 1, 4, and 5). Plaintiff's complaint also alleges that Defendants Allan Martin and Kendra Seip retaliated against him (Counts 3 and 4).

Specifically, Plaintiff's complaint, as narrowed by the Court's threshold order (Doc. 17), alleges that he suffered from stomach pain which he believed to be an abdominal muscle tear (Doc. 17, p. 3). Plaintiff alleges that Dr. Vipin Shaw merely prescribed him Zantac and told Plaintiff to drink more water, but did not prescribe Plaintiff pain medication or order an MRI. Plaintiff further alleges that he wrote numerous grievances which Christine Brown reviewed but she failed to provide Plaintiff with medical care (*Id*. at p. 7). Similarly, Plaintiff's complaint alleges that he wrote letters to Art Funk, director of healthcare services provided to IDOC by Wexford, asking for help with his medical issues, but that Funk refused to help Plaintiff obtain proper medical care.

Plaintiff's complaint further alleges that he was retaliated against by Warden

Allan Martin and Kendra Seip for the numerous grievances he wrote regarding his medical care. Plaintiff's complaint alleges that Martin had Plaintiff's cell shook down on numerous occasions because of Plaintiff's grievances (Doc. 17, p. 4). Plaintiff alleges that Seip retaliated against Plaintiff for his grievances by writing a disciplinary ticket against him, causing him to be placed in segregation and ultimately transferred to a Level 2, a higher security, prison (*Id*. at p. 5).

In response to Plaintiff's complaint, Defendants originally filed motions for summary judgment arguing that Plaintiff failed to exhaust his administrative remedies (Docs. 47 and 50). Without holding a hearing, the magistrate judge assigned to the case at the time, recommended that the district court grant the motions, finding that Plaintiff had failed to properly exhaust a number of his grievances. While the magistrate judge acknowledged that Plaintiff's May 6 and 10, 2013 grievances were properly resolved on March 14, 2014, by that time Plaintiff had already filed his complaint. Thus, the magistrate judge recommended that the district judge find that Plaintiff failed to exhaust his administrative remedies prior to filing suit (Doc. 61). The district judge adopted the magistrate judge's findings on December 23, 2015 (Doc. 68) and judgment was entered the same day (Doc. 69).

However, Plaintiff appealed the district court's decision regarding his failure to exhaust administrative remedies. The Seventh Circuit ultimately reversed the Court's findings as it failed to hold a hearing to determine whether Plaintiff waited an appropriate amount of time for the ARB's response to his May 2013 grievances prior to

filing suit (Doc. 85-1, p. 3-4). The Seventh Circuit also noted that the Court should have held a hearing to determine if four of the six grievances that were returned for procedural mistakes were properly exhausted or appropriately denied on procedural grounds (*Id.* at p. 4). On remand, the Court entered new scheduling deadlines, including a deadline to re-file any dispositive motions on the issue of administrative exhaustion (Doc. 91).

In response, Defendants re-filed summary judgment motions, arguing that Plaintiff failed to exhaust his administrative remedies prior to filing suit. Defendants identify several grievances relevant to Plaintiff's claims, including grievances dated: April 19, 2011, November 17, 2011, October 6, 2012, December 12, 2012, August 3, 2013 and May 2013. Plaintiff admits that the May 2, 2011 and November 17, 2011 grievances were not properly exhausted,[1] but he argues that the others were improperly denied or not responded to in a timely manner. Plaintiff also argues that he sought to exhaust a grievance dated May 21, 2012 but he never received a proper response to that grievance.

Plaintiff's October 6, 2012 grievance was received by the ARB on October 15, 2012. It does not include a counselor's or grievance officer's response (Doc. 96-1, p. 12). The grievance was written while Plaintiff was at Pinckneyville Correctional Center and grieves events which took place at Shawnee Correctional Center. The grievance alleges that Plaintiff wrote a grievance on August 17, 2012 regarding a disciplinary report that

---

[1] These two grievances allege retaliation by Allen Martin and Kendra Seip (Doc. 96-1, p. 6-7, 9-10). Plaintiff sent the grievances directly to the ARB and they were returned for not having a counselor or grievance officer response (*Id.* at p. 3, 8).

he sent directly to Investigation and Intelligence for review. The intelligence officer sent the grievance to Pinckneyville's warden and Plaintiff complains that he never received any paperwork related to the grievance nor did he receive a response to the grievance. The grievance indicates that Plaintiff has attached the August 17, 2012 grievance for the ARB's review (*Id*.). The ARB returned the grievance, along with Plaintiff's May 21, 2012 grievance, on October 23, 2013 (*Id*. at p. 11). The response indicates that Plaintiff failed to provide the grievance officer's response and that the grievance may be untimely (*Id*.).

Plaintiff's October 6, 2012 grievance indicates that his August 17, 2012 grievance was attached for the ARB's review (Doc. 96-1, p. 12). That grievance was related to a disciplinary report that he received from Kendra Seip dated July 13, 2012 (Doc. 1, p. 30-31). Plaintiff admits in his response that he sent the August 17, 2012 grievance directly to Larry C. Beck, Chief of IDOC's Investigations and Intelligence division in hopes of getting "some attention drawn to his issues" (Doc. 98, p. 5). Plaintiff indicated in his original response to the previous summary judgment motion that Beck should have sent the grievance to the ARB after investigating it (Doc. 53, p. 3). Beck forwarded the grievance to the warden at Pinckneyville because it was an institutional issues and Plaintiff was housed at Pinckneyville (Doc. 53-3, p. 1). Plaintiff argues in his response that the grievance should have been returned to him (Doc. 98, p. 5).

Plaintiff's December 12, 2012 grievance complains that he has been treated for the last two years for a stomach ailment but that the proper testing has never been done to

determine the cause of Plaintiff's stomach problems (Doc. 96-1, p. 16-17). Plaintiff complains that the only tests he has received are x-rays and blood work which will not show if he has a tear in his stomach and he seeks a GI series. The grievance was received by his counselor on December 13, 2012 and responded to on December 28, 2012 (*Id.*). The grievance officer and chief administrative officer denied the grievance on January 28, 2013 (*Id.* at p. 15). The grievance was received by the ARB on February 4, 2013 (*Id.* at p. 14). The ARB declined to review the grievance because Plaintiff failed to cite a date he visited healthcare in his grievance that was within 60 days of the date he submitted the grievance (*Id.* at p. 14). **20 Ill. Admin. Code § 504.810(a) ("A grievance must be filed…within 60 days after the discovery of the incident, occurrence, or problem that gives rise to the grievance.").** Plaintiff argues in his response that he had been to the healthcare unit at both Shawnee and Pinckneyville multiple times and that he suffered from continuing deliberate indifference and should not have had to supply a date of his last visit that was within 60 days of his grievance. He acknowledges in his response that the last time he was seen in the healthcare unit prior to filing his December grievance was on September 20, 2012 (Doc. 98, p. 6). Medical records confirm that Plaintiff was last seen in September 2012, albeit on September 24, 2012 (Doc. 9-1, p. 8).

Plaintiff also submitted two grievances in May 2013 which are the focus of the Seventh Circuit's opinion which remanded the case back to this Court for further review. Plaintiff's May 6, 2013 grievance relates to his stomach pain. Plaintiff's grievances were fully exhausted at the institutional level, a fact Defendants do not dispute, and were

received by the ARB on June 26, 2013 (Doc. 96-1, p. 19-20). The grievances were reviewed on March 14, 2014, almost nine months after the ARB received Plaintiff's grievances (*Id.* at p. 18). By then Plaintiff had already filed his complaint, which was received by the Court on January 21, 2014. Defendants argue that Plaintiff filed his complaint too soon. While they acknowledge that the Illinois Administrative Code requires that director to review and make a final determination on a grievance "within six months after receipt of the appealed grievance," they note that the code also indicates that the six month deadline is an aspiration rather than a requirement as the section states that the director shall make a determination within six months "when reasonably feasible under the circumstances." **20 Ill. Admin. Code § 504.850(e).**

Defendants argue that the six month deadline in this case was not reasonably feasible due to the unique circumstances at the administrative review board during the relevant time period. Defendants offer the testimony of Sarah Johnson, the current ARB chairperson, to support their argument (Doc. 96-1, p. 51-55). Johnson testified that the ARB has a number of duties that impact the timeline of responding to grievances including reviewing files for the attorney general and for subpoenas, reviewing revocations and restorations of good time credit, and reviewing and returning mail to inmates (*Id.* at p. 54). Johnson also testified that during the relevant time period, the ARB had only five chairpersons instead of seven, that the chairpersons had to do their own copying and sorting due to staff shortages, and that the office was working on a large request for documents in another case, which pushed their grievance responses

back by approximately one month.   Defendants argue that the ARB informed Plaintiff that they would get to his grievance as soon as possible, in response to a request for status from Plaintiff (Doc. 96-1, p. 50).   Plaintiff argues, however, that he was never informed of these delays and thus had no knowledge that his grievance was being reviewed by the ARB or that its response would be delayed.   As such, Plaintiff filed his complaint after not receiving a response from the ARB within six months.

Plaintiff also points to a grievance he wrote on May 21, 2012 (Doc. 96-1, p. 39-40). That grievance discusses his stomach problems and issues with the healthcare unit. Plaintiff specifically mentions speaking with Dr. Shah on March 25, 2012 (*Id*.).   The grievance was received by the counselor on May 24, 2012 (*Id*.).   The response indicates that he was seen by Dr. David for hypertension, not gastro-intestinal issues, and Plaintiff was reminded that he needed to request care through the sick-call procedures (*Id*.).   The grievance was responded to on June 12, 2012.   The grievance is marked that it was received by the grievance office at Pinckneyville on October 23, 2012.   That grievance was received by the ARB on October 15, 2012 (Doc. 96-1, p. 11).   The grievance was returned to Plaintiff because it did not have a response from the grievance officer (Doc. 51-1, p. 4).

Plaintiff, in his response, indicates that he turned the grievance into his grievance officer/counselor K. Seip and spoke to her about the bias of responding to the grievance as both the counselor and the grievance officer (Doc. 98, p. 2).   Plaintiff acknowledges

that he received the grievance back with Michael Nolen's signature[2] on the grievance as counselor (*Id.*).   However, Plaintiff argued that K. Seip actually wrote the response but had Michael Nolen sign off on the response to avoid the appearance of bias.   He was then called to Siep's office on July 13, 2012 to talk about the counselor response and the fact that the response handwriting did not match Michael Nolen's signature (*Id.*; Doc. 48-1, p. 41).   Plaintiff argues that he never received a response from the grievance office and was subsequently transferred to Pinckneyville Correctional Center on July 27, 2012 (Doc. 48-1, p. 41).   Thus, he sent the grievance directly to the ARB after his transfer (Doc. 98, p. 3).

## B. *Pavey* Hearing

In light of the factual issues raised by Defendants' motions, the undersigned held a hearing pursuant to *Pavey v. Conley*, **544 F.3d 739, 740-41(7th Cir. 2008)** on September 11, 2017.[3]

### 1. *Kendra Seip*

The Court first heard testimony from Kendra Seip.   Seip was a Correctional

---

[2] There was initially some confusion as to whether the counselor who signed the grievance was Michael Allen or Michael Nolen.   Seip testified at the evidentiary hearing that the counselor's name was Michael Nolen.

[3] The undersigned notes that Plaintiff indicated at the start of the hearing that he was going blind and had previously requested counsel due to his vision problems.   While the undersigned initially indicated that the Court was not aware of Plaintiff's vision problems, that was a mistake as Plaintiff has informed the Court in past motions, including a recent motion for appointment of counsel (Doc. 99), that he has a vision condition that is causing him to go blind.   The undersigned denied that motion for counsel as Plaintiff appeared to understand the issues related to exhaustion of administrative remedies and appeared competent to represent himself at the hearing.   While Plaintiff indicated at the hearing that he has vision problems, and while the undersigned does not dispute that he does, Plaintiff spoke intelligently about the issues related to the evidentiary hearing and he was able to reference documents.   He was also able to review documents placed in front of him and testify knowledgably about those documents.   The undersigned maintains that counsel was not needed for resolution of the issues regarding administrative exhaustion.

Counselor II in 2012. She also served as a grievance officer during that time period (*See also* Doc. 98-1, p. 7). While she acted as both counselor and grievance officer, Seip testified that she did not review a grievance as both the counselor and grievance officer. Seip testified that she spoke to Plaintiff twice about a grievance. The first time she spoke to him, she did not remember seeing a grievance. She saw him again in July and she had received his grievance and she told him to forward it to the grievance officer. At that time, he already had a counselor response and, according to Seip, it was Plaintiff's responsibility to forward it to the grievance officer through the institutional mail. Seip testified that it is prison policy that the grievance is submitted to the grievance officer through institutional mail. Seip later testified that she did not receive a grievance from Plaintiff in July but that she received a grievance from Plaintiff the first time she spoke to him, which was in April or May 2012. At that time, Plaintiff was angry that he was not getting his grievances back from a previous counselor and Seip told him to hand the grievances directly to her and she would make sure that he received a counselor response to those grievances.

Seip testified that Plaintiff received a counselor response to his May 21, 2012 grievance. That grievance is signed by Michael Nolen. She does not recall ever receiving a copy of the grievance for a response as the grievance officer. Seip maintained that Plaintiff did not give her a grievance during their meeting in July. At that meeting, Plaintiff complained that the handwriting on the counselor's response did not match the signature on the response. Seip returned the counselor's response to

Plaintiff on June 12, 2012 and a memo from Seip was attached to the grievance (*See* Doc. 9-1, p. 20). Seip acknowledged that she sent the May 21, 2012 grievance back to Plaintiff with Nolen's signature on it. She had Nolen respond to the grievance because Plaintiff was on her case load and she was the grievance officer at the time. Seip testified that Nolen reviewed the grievance and indicated how he was going to respond and signed the response. Seip acknowledged that Plaintiff's assessment regarding the May 21, 2012 grievance was correct; Seip wrote the narrative of the response and Nolen signed the response as counselor.

Seip acknowledged that she met with Plaintiff again in July, specifically July 13, 2012 as is documented in the cumulative counseling summary (See Doc. 9-1, p. 29). Seip testified that she sent Plaintiff a call pass for a routine visit (Doc. 98-1, p. 2). As a correctional counselor she is supposed to see inmates every sixty days, but she testified that she tries to see inmates every twenty to thirty days. At that time, Seip testified Plaintiff was argumentative and kept asking about the handwriting on the counselor's response. She told him it was Nolen's signature, but he kept arguing. She testified that Plaintiff did not attempt to give her a grievance at that time. She explained to him the grievance process and told him to submit his grievance to the grievance officer through the institutional mail. Seip testified that while in her office, Plaintiff refused to take a seat and instead came around the desk and blocked her exit and proceeded to yell at her about her handwriting being on the grievance. In response, she explained to him the grievance procedures and told him that he needed to submit his grievance through

institutional mail.

## 2. *Sarah Johnson*

Sarah Johnson testified about her duties as an ARB chairperson. She testified that from 2013-2014 there were issues at the ARB which caused delays in responding to grievances. These issues included a shortage of support staff, a large document request in another case, and a shortage of ARB chairpersons. She testified that these shortages and additional work put the office farther behind in responding to grievances than the six months suggested by the administrative code. The ARB was still responding to grievances during this time period, but the responses were delayed.

Johnson acknowledged that she received a letter from Plaintiff requesting the status of his grievances. She has received letters requesting status from inmates in the past and she updates the inmates on the status of their grievances on the letters themselves. Johnson testified that she usually responded to the inmate letters within a few days after they are marked as received. Letters are responded to quicker than grievances as they are reviewed with the incoming mail, while grievances are placed in a separate file to be answered in the order that they come in. The letters, however, are reviewed and responded to when the mail is reviewed. Johnson testified that in responding to a letter, she would pull up the IGRV file to determine that the ARB had the grievance and then she would inform the inmate that he would receive a response soon.

Johnson acknowledged that her handwriting is on the bottom corner of the

January 8, 2014 letter from Plaintiff and it indicates that the ARB received his grievances and he will receive a response as soon as possible (Doc. 96-1, p. 50). Johnson acknowledged that she did not date the response as she does not typically date the responses. The ARB also does not log responses to letters so there would be no log of when Johnson actually responded to Plaintiff's letter. However, Johnson testified that letters from inmates are usually reviewed a few days after they are stamped received. After the ARB responds to the letter, the letter, with the response, is put back in a folder directed to the inmate's facility. Grievance responses and responses to letters are collected in the folder and then sent back to the grievance officer at the respective prison at the end of the week, on Friday, through the ARB's mailroom. The ARB then relies on the grievance officer and institutional mail at the facility to return materials to the inmate.

### 3. *Plaintiff*

Plaintiff testified as to his grievances. Plaintiff testified that he received a response to his May 21, 2012 grievance that was signed by Michael Nolen. He did not receive a grievance officer response to that grievance.

Plaintiff further testified that he can access the mail at the prison by either placing his correspondence in the mailbox at the prison or by giving it to an officer. He does not know how long it takes for the mail to get out of the prison and he does not know the steps that the mail goes through before it leaves the prison. Similarly, he does not know the steps mail goes through once it enters the prison. He knows that family

correspondence are usually searched by the mailroom and then given to the inmate, while legal mail, including mail from the ARB and federal courts, are usually given to the inmate directly and have a receipt with them. Legal mail is opened in front of the inmate.

Plaintiff testified that he wrote a letter to the ARB in January inquiring about the status of his grievances (Doc. 96-1, p. 50). The date indicates that it was written January 8, 2014 and he believes that he mailed the letter the same day that it was written. It was stamped as received by the ARB on January 13, 2017. While he does not recall the exact amount of time the grievances had been with the ARB at the time he wrote his letter, he had sent the grievances at least six months prior and was thus asking about the status. Plaintiff knows that the ARB usually responds to grievances within six months whenever possible as the administrative code states that as the timeline for grievance responses from the ARB. He was relying on the provisions of the code when he sent his letter asking for status.

Plaintiff acknowledged that his complaint was filed prior to him receiving a response to his letter from the ARB. Plaintiff testified that he received the letter on March 13, 2014, which he dated on the letter. He signed for the letter as mail from the ARB is dated privileged and thus an officer brings that correspondence to his cell and Plaintiff signs a receipt for the letter. Plaintiff testified that there should be a receipt somewhere in IDOC's records. Plaintiff testified that he had no knowledge of any staffing issues with the ARB as set forth in Sarah Johnson's affidavit.

Plaintiff testified that the mail is not consistent in the prisons. While some letters may take as many as 21-28 days to receive, it usually took 10 days to receive a letter inside the prison from the date it was sent. Court mail was usually quicker, usually within 10 days, as he believes the mailroom prioritizes legal mail. Plaintiff testified that ARB mail was usually a little slower as it was treated more like personal mail, as opposed to legal mail from the courts.

As to the call pass he received from Seip, Plaintiff testified that all call passes indicate that the meeting is "routine contact" (See Doc. 98-1, p. 2).

On cross, Plaintiff testified in the narrative about his grievances. As to the May 21, 2012 grievance, Plaintiff testified that he first sent the grievance to Seip and informed her that she could not respond to the grievance as both the counselor and the grievance officer. He received the grievance back from her on June 12, 2012 (*See* Doc. 9-1, p. 20). He disagreed with Michael Nolen's signature and sent the grievance back to Seip on July 5, 2012 (*Id.*). He then received a call pass from Seip to come talk to her and Plaintiff assumed that she wanted to discuss his May 21, 2012 grievance. When he spoke with her on July 13, 2012 he asked her if she received a copy of his grievance and she indicated that she did not know. He then gave her another copy of the grievance and told her that he thought Michael Nolen's signature was forged. When he was later taken to segregation, he saved an original copy of his May 21, 2012 grievance by keeping it in his pocket.

While in segregation, Plaintiff asked his counselor if he could write a grievance on

Seip and he was informed that the counselor could not hear a grievance on another counselor and that Plaintiff would have send the grievance to clinical services supervisor Karen Jaimet. Plaintiff sent a grievance dated July 28, 2012 to Jaimet but never heard a response and was transferred shortly thereafter (Doc. 9-1, p. 13). When he transferred to Pinckneyville, some of his materials were lost but he received some grievances back that he had sent to the street and he then wrote a grievance to Larry Beck in IDOC's Intelligence and Investigation division. That grievance was sent back to the warden at Pinckneyville and not returned to him until October 2012. By then, Plaintiff acknowledged that it was too late to send to the ARB. He believed that Beck would forward the grievance to the ARB, but Beck sent the grievance back to Pinckneyville. He acknowledged that he should have sent the grievances directly to the ARB but he wanted the issues investigated and sent it to Beck with a request to him to forward the grievance to the ARB.

### 4. *Offender Orientation Manual*

At the hearing, counsel for the IDOC Defendants asked to supplement the record by providing the Court with a copy of the Offender Orientation Manual for Shawnee Correctional Center. Counsel indicated that the manual would show that grievances had to be submitted to the grievance office through institutional mail, as indicated by Seip in her testimony. Defendants subsequently filed a motion to supplement, which the undersigned granted. The Offender Orientation Manual indicates that grievances "shall be addressed to the grievance officer and shall be deposited in the living unit

mailbox." (Doc. 120-1, p. 10).

LEGAL STANDARDS

**A.      Summary Judgment Standard**

Summary Judgment is proper if the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material fact such that [Defendants are] entitled to judgment as a matter of law." *Wragg v. Village of Thornton*, **604 F.3d 464, 467 (7th Cir. 2010).** Lawsuits filed by inmates are governed by the provisions of the Prison Litigation Reform Act ("PLRA"). **42 U.S.C. §1997e(a).** That statute states, in pertinent part, that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* **(emphasis added).** The Seventh Circuit requires strict adherence to the PLRA's exhaustion requirement. *Dole v. Chandler*, **438 F.3d 804, 809 (7th Cir. 2006) (noting that '[t]his circuit has taken a strict compliance approach to exhaustion").** Exhaustion must occur before the suit is filed. *Ford v. Johnson*, **362 F.3d 395, 398 (7th Cir. 2004).** Plaintiff cannot file suit and then exhaust his administrative remedies while the suit is pending. *Id.* Moreover, "[t]o exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison administrative rules require." *Pozo v. McCaughtry*, **286 F.3d 1022, 1025 (7th Cir. 2005).** Consequently, if a prisoner fails to properly utilize a prison's grievance process, "the prison administrative authority can refuse to hear the case, and the prisoner's claim can be indefinitely

unexhausted." *Dole*, **438 F.3d at 809.**

Under *Pavey*, the Seventh Circuit held that "debatable factual issues relating to the defense of failure to exhaust administrative remedies" are not required to be decided by a jury but are to be determined by the judge. *Pavey v. Conley*, **544 F.3d 739, 740-41(7th Cir. 2008).** Thus, where failure to exhaust administrative remedies is raised as an affirmative defense, the Court set forth the following recommendations:

> The sequence to be followed in a case in which exhaustion is contested is therefore as follows: (1) The district judge conducts a hearing on exhaustion and permits whatever discovery relating to exhaustion he deems appropriate. (2) If the judge determines that the prisoner did not exhaust his administrative remedies, the judge will then determine whether (a) the plaintiff has failed to exhaust his administrative remedies, and so he must go back and exhaust; (b) or, although he has no unexhausted administrative remedies, the failure to exhaust was innocent (as where prison officials prevent a prisoner from exhausting his remedies), and so he must be given another chance to exhaust (provided that there exist remedies that he will be permitted by the prison authorities to exhaust, so that he's not just being given a runaround); or (c) the failure to exhaust was the prisoner's fault, in which event the case is over. (3)If and when the judge determines that the prisoner has properly exhausted his administrative remedies, the case will proceed to pretrial discovery, and if necessary a trial, on the merits; and if there is a jury trial, the jury will make all necessary findings of fact without being bound by (or even informed of) any of the findings made by the district judge in determining that the prisoner had exhausted his administrative remedies.

*Id*. at 742.

## B. Illinois Exhaustion Requirements

As an inmate confined within the Illinois Department of Corrections, Plaintiff was required to follow the regulations contained in the Illinois Department of Correction's Grievance Procedures for Offenders ("grievance procedures") to properly exhaust his

claims. **20 Ill. Administrative Code §504.800** *et seq.* The grievance procedures first require inmates to file their grievance with the counselor within 60 days of the discovery of an incident. **20 Ill. Admin. Code §504.810(a).** The grievance form must:

> contain factual details regarding each aspect of the offender's complaint, including what happened, when, where, and the name of each person who is the subject of or who is otherwise involved in the complaint. This provision does not preclude an offender from filing a grievance when the names of individuals are not known, but the offender must include as much descriptive information about the individual as possible.

**20 Ill. Admin. Code §504.810(c).** Grievances that are unable to be resolved through routine channels are then sent to the grievance officer. **20 Ill. Admin. Code §504.820(a).** The Grievance Officer will review the grievance and provide a written response to the inmate. **20 Ill. Admin. Code §504.830(a).** "The Grievance Officer shall consider the grievance and report his or her findings and recommendations in writing to the Chief Administrative Officer within two months after receipt of the grievance, when reasonably feasible under the circumstances." **20 Ill. Admin. Code §504.830(e).** "The Chief Administrative Officer shall review the findings and recommendation and advise the offender of his or her decision in writing. *Id.*

If the inmate is not satisfied with the Chief Administrative Officer's response, he or she can file an appeal with the Director through the Administrative Review Board ("ARB"). The grievance procedures specifically state, "[i]f, after receiving the response of the Chief Administrative Officer, the offender still believes that the problem, complaint or grievance has not been resolved to his or her satisfaction, he or she may

appeal in writing to the Director. The appeal must be received by the Administrative Review Board within 30 days after the date of the decision. " **20 Ill. Admin. Code §504.850(a).** The inmate shall attach copies of the Grievance Officer's report and the Chief Administrative Officer's decision to his appeal. *Id.* "The Administrative Review Board shall submit to the Director a written report of its findings and recommendations." **20 Ill. Admin. Code §504.850(d).** "The Director shall review the findings and recommendations of the Board and make a final determination of the grievance within 6 months after receipt of the appealed grievance, when reasonably feasible under the circumstances. The offender shall be sent a copy of the Director's decision." **20 Ill. Admin. Code §504.850(e).**

The grievance procedures do allow for an inmate to file an emergency grievance. In order to file an emergency grievance, the inmate must forward the grievance directly to the Chief Administrative Officer ("CAO") who may "[determine] that there is a substantial risk of imminent personal injury or other serious or irreparable harm to the offender" and thus the grievance should be handled on an emergency basis. **20 Ill. Admin. Code §504.840(a).** If the CAO determines the grievance should be handled on an emergency basis, then the CAO "shall expedite processing of the grievance and respond to the offender" indicating to him what action shall be taken. **20 Ill. Admin. Code §504.840(b).** If the CAO determines the grievances "should not be handled on an emergency basis, the offender shall be notified in writing that he or she may resubmit the grievance as non-emergent, in accordance with the standard grievance process. **20**

**Ill. Admin. Code §504.840(c).** When an inmate appeals a grievance deemed by the CAO to be an emergency, "the Administrative Review Board shall expedite processing of the grievance." **20 Ill. Admin. Code §504.850(f).**

ANALYSIS

## A. Deliberate Indifference

As to Plaintiff's deliberate indifference claim, there are three grievances in the record related to Plaintiff's claim. Plaintiff submitted a December 12, 2012 grievance, a May 21, 2012 grievance, and May 2013 grievances related to his stomach ailments.

### 1. *December 12, 2012 Grievance*

The undersigned finds that Plaintiff's December 12, 2012 grievance was properly rejected by the ARB as untimely. The ARB rejected the grievance because it did not grieve an event which occurred within sixty days of the filing of his grievance (Doc. 96-1, p. 14). The administrative code requires that grievances be filed "within 60 days after the discovery of the incident, occurrence or problem that gives rise to the grievance. **20 Ill. Admin. Code § 504.810(a).** Plaintiff admitted in his response that his last doctor visit before filing his December 12, 2012 grievance was on September 20, 2012 (Doc. 98, p. 6). Medical records confirm that Plaintiff was last seen in September 2012, albeit on September 24, 2012 (Doc. 9-1, p. 8). There is no indication in the record that he was seen by the doctor after that date, but prior to submitting his December 12 grievance. Thus, the ARB was correct in rejecting his grievance as untimely as he did not submit his grievance within sixty days of his last doctor's visit.

## 2. *May 21, 2012 Grievance*

Turning to Plaintiff's May 21, 2012 grievance, Defendants argue that Plaintiff failed to exhaust this grievance because it was rejected by the ARB for not having a grievance officer's response and was submitted outside of the 60 day time frame (Doc. 96-1, p. 11). Plaintiff argues that he never received a response from the grievance officer, Kendra Seip. If true, then his attempts at exhaustion would be deemed thwarted and he may proceed with his lawsuit. *See Walker v. Sheahan*, **526 F.3d 973, 979 (7th Cir. 2000) (an inmate is not required to appeal his grievance if he submits the grievance to the proper authorities but never receives a response);** *Dole v. Chandler*, **438 F.3d 804, 809 (7th Cir. 2006) (a remedy can be unavailable to a prisoner if the prison does not respond to the grievance or uses misconduct to prevent a prisoner from exhausting his resources);** *Brown v. Darnold*, **2010 WL 3702373, at \*3 (S.D. Ill. 2010) ("The Seventh Circuit has held that administrative remedies become 'unavailable' when prison officials fail to respond to inmate grievances." (quoting** *Lewis v. Washington*, **300 F.3d 829, 833 (7th Cir. 2002)).**

The history regarding Plaintiff's attempts to exhaust his May 21, 2012 grievance at the institutional level is confusing, mostly due to the fact that Kendra Seip was acting as both the counselor and the grievance officer during this time period (Doc. 96-1, p. 42). Seip acknowledged at the evidentiary hearing that she served as both the counselor and grievance officer during the relevant time period but that she did not review grievances under both duties. However, Seip also acknowledged in her testimony that she filled in

the narrative part of the counselor's response on May 21, 2012 and that Michael Nolen signed the response. She testified that Nolen indicated how he wanted to respond and she filled it in and then returned the grievance to Plaintiff. Plaintiff acknowledged that he received the response and that the discrepancy between the narrative and the signature caused him angst as he believed that Seip had inappropriately responded to his grievance as counselor when she would also be reviewing his grievance as the grievance officer.

In any event, Plaintiff testified that he submitted the grievance back to Seip through the institutional mail on July 5, 2012. This is supported by a notation by Plaintiff on the memorandum from Seip returning his grievance from the counselor (Doc. 9-1, p. 20). It indicates that Plaintiff resent the grievance to Seip, who was the grievance officer at the time, on July 5, 2012. The Court finds Plaintiff's testimony on this point to be credible. He then received a pass from Seip on July 13, 2012 which he believed to be in regards to his grievance (Doc. 98-1, p. 2). Seip testified that Plaintiff was angry and confronted her about the signature on his May 21, 2012 grievance. The Court does not condone Plaintiff's behavior but notes that he was correct in stating that Seip handwrote the response and had Nolen sign the grievance response; thus Plaintiff was right in noting that the response handwriting did not match the signature (although wrong in the way in which he approached Seip about the discrepancy). Seip testified that Plaintiff did not have the May 21 grievance with him nor did he try to hand the grievance to her, although she testified that she explained to him at that time that

grievances were to be mailed to the grievance officer by institutional mail.

The Court finds Seip's testimony regarding Plaintiff's May 21 grievance to be confusing and contradictory. She originally stated that she met with Plaintiff twice and that the first time she did not recall seeing a grievance and the second time she saw him in July she had received his grievance and told him to forward it to the grievance officer. She later testified that she did not see a grievance during their July 13, 2012 meeting and that she received a grievance from him at their first meeting in April or May of that year. She also indicated that she did not receive a copy of Plaintiffs' grievance as the grievance officer. The Court finds Plaintiff's testimony that he submitted the grievance back to her on July 5, 2012 to be credible. Plaintiff marked on the memo from Seip that it was returned to her on July 5, 2012. Plaintiff testified that he asked Seip at their July 13, 2012 meeting whether she had received his grievance and she said she did not know. Further Seip's notation on the cumulative counseling summary indicates that Plaintiff demanded that she find his original grievance, suggesting that he had sent it to her and inquired about it as he testified. Seip also informed him that he needed to submit the grievance to the grievance officer for review. But during this time period, Seip was the grievance officer. Shawnee's manual indicates that the grievance must be sent through the institutional mail to the grievance officer, which is what Plaintiff testified that he did. While he may have *resent* the grievance to Seip as opposed to the grievance office, Seip was the grievance officer and the procedures called for him to submit the grievance to the grievance officer.

The undersigned finds that this issue was needlessly confused by the fact that Seip served as both Plaintiff's counselor and the grievance officer. She returned Plaintiff's grievance to him as his counselor and also acknowledged that she wrote the response to the grievance, although she testified it was Nolen's response and just her handwriting. But this caused needless angst and confusion for Plaintiff that did not have to occur. Further, she directed him to submit his grievance to the grievance officer, but at the time, she was serving as the grievance officer. Thus, if he submitted the grievance directly to her by institutional mail, which it appears that he did, he was in essence submitting the grievance to the grievance officer. The undersigned also notes that the grievance logs were not provided so it is not clear whether the May 21, 2012 grievance was ever received by Seip. As such, the undersigned finds that Defendants have not met their burden of demonstrating that Plaintiff failed to exhaust his May 21, 2012 grievance. Rather, the evidence suggests that Plaintiff sought to submit his grievance to Seip as the grievance officer and it was never returned to him, thus thwarting his attempts at exhaustion.

### 3. *May 2013 Grievance*

However, as to Plaintiff's May 2013 grievance, the undersigned finds that Plaintiff failed to exhaust his administrative remedies *prior* to filing suit. Exhaustion is a precondition to filing suit; a prisoner may not file suit in anticipation that his administrative remedies will soon become exhausted. ***Ford v. Johnson*, 362 F.3d 395, 398 (7th Cir. 2004).** A prisoner must wait to bring a suit until he completes the

exhaustion process.   *Perez v. Wisconsin Dept. of Corrections*, **182 F.3d 532, 535 (7th Cir. 1999) (citing 42 U.S.C. § 1997e(a)).**   The Seventh Circuit instructed this Court to hold a hearing to determine whether Plaintiff knew when he filed his lawsuit that he could expect a decision from the director reasonable soon (Doc. 85-1, p. 4).   The administrative code indicates that grievances should be ruled on by the ARB within six months, "when reasonably feasible under the circumstances".   **20 Ill. Admin. Code § 504.850(e).** Defendants argue that the ARB was behind on grievance responses due to a number of factors and that Plaintiff was informed that his grievance would be responded to as soon as possible.   Plaintiff argues that response did not come until March 2014, well after the six month deadline for submitting a response and after he submitted his lawsuit.

The evidence before the Court indicates, however, that Plaintiff sought information from the ARB regarding the status of his grievance, but did not wait for the ARB to reply before filing his lawsuit.   Plaintiff submitted a note asking for the status of his grievance on January 8, 2014.   The ARB received that note on January 13, 2014.   But Plaintiff also typed up his original complaint on January 8, 2014 (Doc. 1, p. 15).   He sent that complaint to the Court on January 17, 2014 (Doc. 1-3) and it was received by the Court on January 21, 2014 (Doc. 1).   Thus, Plaintiff did not give the ARB enough time to receive and respond to his request for status prior to filing suit.   Plaintiff testified at the evidentiary hearing that mail usually runs behind in the prison setting and that ten days was a typical response time for Plaintiff to receive mail that had been sent to him from the outside.   Yet, he sent his complaint out only nine days after sending out his status

request to the ARB, not enough time for the ARB to receive and respond to a request, let alone Plaintiff to receive it.

The undersigned acknowledges that Plaintiff testified he did not receive a response to his letter until March 13, 2014 and for purposes of this motion the Court accepts that testimony as true. And it would not have been reasonable to expect Plaintiff to wait an additional two months, after already waiting six months for a response to his grievance, for the ARB to respond to a status on his grievances. But Plaintiff did not wait any time for a response from the ARB. He sent the ARB a request for a status and almost simultaneously filed his complaint with the Court. He requested a status and should have waited a reasonable amount of time to see if the ARB responded prior to filing suit. He did not do so in this case. As such, the undersigned finds that Plaintiff failed to exhaust his May 2013 grievance prior to filing suit.

B. **Retaliation**

Plaintiff's retaliation claim alleges that Martin had Plaintiff's cell shook down in retaliation for filing grievances and that Seip wrote a bogus disciplinary report against him in retaliation for a grievance Plaintiff wrote. Plaintiff has five grievances related to retaliation by Martin and Seip. Two of those grievances, Plaintiff's April 19, 2011 and November 17, 2011 grievances, were returned by the ARB for failing to attach a counselor or grievance officer response. Plaintiff acknowledges in his response that these two grievances were not properly exhausted and thus cannot serve to exhaust his retaliation claims against Martin and Seip.

Plaintiff testified at the evidentiary hearing that he submitted a grievance on July 28, 2012, while he was in segregation regarding Seip's retaliation. Plaintiff testified that he sent it to Karen Jaimet, the clinical services supervisor, as the grievance pertained to another counselor and could not be heard by the correctional counselors (Doc. 98-1, p. 14). There is no evidence of this grievance being received by staff at Shawnee Correctional Center and Plaintiff was subsequently transferred to Pinckneyville Correctional Center shortly thereafter. There is also no evidence to suggest that Plaintiff was informed that Shawnee would respond to the grievance. Plaintiff then tried to submit the grievance for further review, but it appears that grievance was submitted to Investigations and Intelligence rather than the ARB. It subsequently was not received by the ARB until October 15, 2012, making it untimely (Doc. 1-1, p. 28). Thus, the undersigned finds that Plaintiff failed to exhaust his July 28, 2012 grievance.

Plaintiff's August 17, 2012 grievance also relates to Plaintiff's retaliation claim against Seip. That grievance alleges that Seip inappropriately wrote him a disciplinary ticket in retaliation for writing grievances regarding his stomach condition, which caused him to be transferred to a higher security level prison (Doc. 1, p. 30-31). Plaintiff's grievance requests that he be moved back to a lower security level, that his stomach condition be treated, and that Seip be removed from the grievance officer position (*Id*. at p. 30). At the time Plaintiff wrote the grievance, he was housed at Pinckneyville Correctional Center and could have submitted the grievance directly to the ARB as the claims in the grievance arose while he was housed at Shawnee

Correctional Center (*Id.* at p. 30). *See* **20 Ill. Admin. Code § 504.870(a)(3) ("Offenders shall submit grievances directly to the Administrative Review Board when grieving…[d]ecisions regarding disciplinary proceedings that were made at a facility other than the facility where the offender is currently assigned.").** However, Plaintiff did not submit his grievance to the ARB as is allowed under the Code. Instead, Plaintiff, admittedly, submitted his grievance to IDOC's Investigations and Intelligence division (Doc. 98-1, p. 13; 98, p. 5). While Plaintiff hoped that the division would investigate the matter and then turn the grievance over to the ARB, Plaintiff sent the grievance to the wrong location for grievance purposes. Submitting his grievance to the Investigations and Intelligence division to start an investigation does not provide a substitute to the administrative grievance process. *See Pavey v. Conley*, **663 F.3d 899, 905-906 (7th Cir. 2011).** For Plaintiff to properly exhaust, he must submit his grievance to the proper forum and he did not do so with his August 17, 2012 grievance. *Id.* **at 906.** As such, Plaintiff failed to exhaust his August 17, 2012 grievance.

Plaintiff argues that he tried to submit his August 17, 2012 grievance directly to the ARB when he submitted the grievance with his October 6, 2012 grievance.[4] His October 6, 2012 grievance indicates that he did not receive the August 17, 2012 grievance back and that he wants the ARB to address the merits of that earlier grievance, which he indicates is attached to the October 6, 2012 grievance. While the October 6, 2012

---

[4] It appears that Plaintiff's July 28, 2012 grievance was also included in that packet to the ARB as it has a file stamp from the ARB of October 15, 2012 as does the August 17, 2012 grievance (Doc. 1-1, p. 27-28). The ARB's response also indicates that the grievances were received on October 15, 2012 (Doc. 96-1, p. 11).

grievance was directed to the right forum, by the time he submitted the grievance to the ARB the issue was untimely. Plaintiff had sixty days from the date of his disciplinary report to file his grievance to the ARB. **20 Ill. Admin. Code § 504.810(a).** *See also Santiago v. Anderson*, **496 Fed. Appx. 630, 637 (7th Cir. 2012) (inmate failed to exhaust when he failed to send grievance directly to the ARB within 60 days)**. Plaintiff received his disciplinary report on July 13, 2012 but did not submit his grievances directly to the ARB until October 6, 2012 where it was received on October 15, 2012. October 6, 2012 is well outside of the sixty day deadline to grievance issues. As such, the October 6, 2012 grievance was properly rejected by the ARB as untimely.

None of Plaintiff's other grievances relate to the retaliation claims against Seip and/or Martin. As Plaintiff failed to properly grieve his claims against these Defendants, the undersigned **RECOMMENDS** that Seip and Martin be **GRANTED** summary judgment.

### CONCLUSION

Accordingly, it is **RECOMMENDED** that the Court **FIND** that Plaintiff failed to exhaust his retaliation claim as to Seip and Martin but properly exhausted his deliberate indifference claim when he submitted his May 21, 2012 grievance for review by the grievance officer but failed to receive a response to that grievance. As such, it is **RECOMMENDED** that the Court **GRANT** summary judgment as to Seip and Martin (Docs. 95 and 96) but **DENY** summary judgment as to Christine Brown (Docs. 95 and 96) as well as Art Funk and Vipin Shaw (Doc. 93).

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 73.1(b), the parties may object to any or all of the proposed dispositive findings in this Recommendation. The failure to file a timely objection may result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. *See, e.g., Snyder v. Nolen*, 380 F.3d 279, 284 (7th Cir. 2004). Accordingly, Objections to this Report and Recommendation must be filed on or before **October 2, 2017**.

**IT IS SO ORDERED**.
DATED: September 14, 2017.

*/s/ Stephen C. Williams*
STEPHEN C. WILLIAMS
United States Magistrate Judge